## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | **UNDER SEAL** |
| | ) | |
| Information Stored at Premises | ) | No. 20 M 392 |
| Controlled by Google, as further described | ) | U.S. Magistrate Judge |
| in Attachment A | ) | Gabriel A. Fuentes |

## SEALED MEMORANDUM OPINION AND ORDER

The government has applied for a search warrant allowing it to obtain information through

use of a technological advancement known as a "geofence."

## INTRODUCTION

The idea behind the warrant is to cast a net – in the form of the geofence – around a

particular location for a particular time frame. Service provider Google, Inc. ("Google") would be

compelled to disclose a list of electronic identifiers for devices known by Google to have traversed

each of three geofences sought by the government. The government could then obtain identifying

subscriber information from Google as to particular devices, selected at the government's

discretion, from the list. In other words, unlike many searches for information collected by a

service provider, the search in this matter does not begin with the government's knowledge of any

individual or account, or of information supporting probable cause to believe that a search of a

specific person's premises will yield evidence of a crime. Instead, the requested search would

operate in reverse. The search would begin with probable cause to believe that an offense occurred

at a particular location at a particular time. The government would then obtain information from

Google identifying the individuals – not now known to law enforcement – or accounts connected

to devices that Google's historical information shows were present in a defined area around the

place of the offense, at the time of the offense. The search protocol can be expected, then, to make available to the government data about the physical location and movements – within the geofenced areas – of an as-yet-unknown number of persons, whose identities or possible links to the subject offense itself are also now unknown. The application before the Court ("the Modified Application") has been modified from an earlier application ("the Initial Application") that was denied by U.S. Magistrate Judge M. David Weisman on July 8, 2020. *See In re Search of Information Stored at Premises Controlled by Google*, No. 20 M 297 (D.E. 4) (N.D. Ill. July 8, 2020) (unsealed on July 16, 2020) ("7/8/20 Order").

## DISCUSSION

Google collects location information data from sources including GPS data, cell-site information, wi-fi access points, and Bluetooth beacons within range of a given mobile device. Google offers an operating system known as Android for mobile devices, and devices using the Android operating system have associated Google accounts. Devices that do not run the Android operating system, such as Apple devices, also communicate with Google through Google applications that are available on Apple products. When a device user enables Google's "location services" on an Android device, or a "location sharing" (with Google) feature on a non-Android device, Google collects and retains location data from that device. The location data can show that a certain device was located at a particular place at a particular point in time – in this case, within the three geofences that the requested warrant would allow to be erected. From this information, the government can seek to identify the device's user, from information the user may have provided to Google. The Modified Application does not quantify an estimated percentage of all devices that communicate with Google in a manner that would transmit location information to Google, but the application suggests that a device that does not do so would be a relatively rare

2

case.[1]  The Modified Application requires the Court to review carefully the evolution of Fourth Amendment law, from its longstanding probable cause and particularity requirements to its application to modern electronic devices and to the privacy interests our courts have recognized as arising from such devices' widespread and everyday use.

## I.      The Fourth Amendment: From the Tudors to Modern Smartphones

The Fourth Amendment requires that search warrants may issue only upon "probable cause" and must "particularly describe[] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Probable cause is a "practical, nontechnical conception" based on "common-sense conclusions about human behavior," and courts determine its existence by analyzing the totality of the circumstances surrounding the proposed intrusion. *Id.* at 231, 238.  The Fourth Amendment's particularity requirement has been described as arising from our founders' aversion to "general warrants" that do not specify where authorities may search or what they may seize.

The Fourth Amendment's purpose is "'to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206, 2213 (2018), quoting *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528 (1967).  The Fourth Amendment has its roots in colonial resistance to "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014).  In 1965, the U.S. Supreme Court

---

[1] The Court will refer to the at-issue devices, whose connection to Google's Android operating system or to Google applications on Apple devices causes them to transit location information to Google as "Google-connected devices."

commented that its past recitations of "the detailed history of the use of general warrants as instruments of oppression from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond" was so well-trodden that to review it again would be "a needless exercise in pedantry." *Stanford v. Texas,* 379 U.S. 476, 482 & n.5 (1965). The Court nonetheless recounted:

> In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan. In later years warrants were sometimes more specific in content, but they typically authorized of all persons connected of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel.

*Id.* at 482-83.

In *Stanford,* the Supreme Court invalidated, as a "general warrant," a state-issued warrant allowing law enforcement officers to search a Texas home for books and records evidencing the occupant's activities in the Communist Party, which was banned under Texas law. *Id.* at 478-79, 486. The Court noted that the words of the particularity requirement of the Fourth Amendment are "precise and clear" and "reflect the determination of those who wrote the Bill for Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Id.* at 481, quoting U.S. Const. amend. IV. General warrants permit "a general, exploratory rummaging in a person's belongings," an "evil" that the Fourth Amendment addresses by requiring a particular description of the things to be seized in the search. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The particularity requirement's bar on general warrants protects not only the sanctity of a person's home but also "the privacies of life." *Berger v. New York*, 388 U.S. 41, 58 (1967), citing *Boyd v. United States*, 116 U.S. 616, 630 (1886). The particularity requirement accomplishes this end by "mak[ing] general searches under them

4

impossible," and "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford*, 379 U.S. at 485.

Our appeals court has recognized that the required specificity, under the Fourth Amendment's particularity requirement, need not be "granular" in its detail because often the executing officer cannot know the nature of the things to be seized with "pinpoint" accuracy. *Archer v. Chisholm*, 870 F.3d 603, 616 (7th Cir. 2017). The Seventh Circuit in *Archer* for example, found no particularity problem with a warrant that identified the petitioner's home as the place to be searched and described "all" documents "relating to" identified contracts or transactions as the things to be seized. *Id.* A warrant authorizing the seizure of "all documents relating to a particular person, place or thing" may be "broadly worded" and "adequately defines the officers' authority [to search for particular items]." 7/8/20 Order at 3, quoting *United States v. Mason*, No. 92-CR-1069, 1993 WL 191806, at *2 (N.D. Ill. June 4, 1993).

The places to be searched in cases like *Stanford* and *Archer* were suspects' homes, but as technology has evolved, law enforcement has sought the authority to search for information stored or generated by electronic devices. And Fourth Amendment jurisprudence has evolved as well, in recognition of the precept that the Fourth Amendment protects people, and not places, against "arbitrary power" directed at "the privacies of life." *Carpenter*, 138 S. Ct. at 2214. Judicial consideration of government requests to obtain information from or through an individual's electronic device or devices has given additional meaning to "the privacies of life," as that term has been used in the case law. In *Riley*, the Court held that a search warrant is required to conduct a search, incident to arrest, of the contents of a suspect's cellular telephone. 573 U.S. at 401. *Riley* based its holding in large part on a recognition that given the large amount of data that some

electronic devices can store, their owners have a reasonable expectation of privacy with respect to the contents:

> Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom. Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers. One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy.

*Id.* at 393. *Riley* was decided six years ago, but the Supreme Court further observed then that personal electronic devices are characterized by "an element of pervasiveness" not applicable to physical records:

> Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception. According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower.

*Id.* at 395.

More recently, in *Carpenter*, the Supreme Court extended the warrant requirement to "cell-site location information" maintained by cellular service providers, reasoning that a legitimate expectation of privacy exists in this type of information, notwithstanding the fact that the providers held the information as "third parties." 138 S. Ct. at 2217. The Supreme Court in *Carpenter* spoke of the device holder's "anticipation of privacy in his physical location":

> Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the

6

> time-stamped data provides an intimate window into a person's life, revealing not
> only his particular movements, but through them his "familial, political,
> professional, religious, and sexual associations." These location records "hold for
> many Americans the 'privacies of life.'"

*Id.*, quoting, among other authorities, *Riley*, 573 U.S. at 403. The cell-site location information

that *Carpenter* held could be obtained only with a search warrant would have disclosed the device

holder's movements across some 13,000 location points during a 127-day time span, based on

stored information about when the device was in contact with specific cell site towers. *Id.* at 2212.

The Supreme Court in *Carpenter* distinguished the cell-site location information, of which

the third-party service provider was aware, from other factual settings giving rise to the "third-

party doctrine," under which persons lack a reasonable expectation of privacy, for Fourth

Amendment purposes, in information revealed to a third party and then conveyed by the third party

to the government. *Id.* at 2218-20. The third-party doctrine is based on the premise that a person's

voluntary sharing of information with the third party defeats an argument that such person has a

legitimate expectation of privacy in the information. *See Smith v. Maryland*, 442 U.S. 735, 743-

44 (1979); *United States v. Miller*, 425 U.S. 435, 443 (1976). *Miller*, for example, involved checks

and other records held by a bank, and the defendant "voluntarily conveyed" such information to

the bank. 425 U.S. at 442. In *Carpenter*, the Supreme Court concluded that this same line of

reasoning, i.e., that persons voluntarily convey the information about their physical location (based

on their devices' contact with cell towers) by virtue of their relationship with the provider as

subscribers to the service, did not apply because of the indispensable role mobile technology plays

in modern society. 138 S. Ct. at 2220. Unlike bank records, cell-site location information is

something a person using a cellphone (meaning, basically, almost everyone) cannot avoid creating,

so the users cannot be said to have voluntarily assumed a risk that they were disclosing "a

comprehensive dossier" of their physical movements." *Id.* This Court applies *Carpenter* to

decline to apply the third-party doctrine to permit the warrant sought in the Modified Application.[2]

The Modified Application presents a different factual setting than did *Carpenter*, although

both cases involve a service provider's compelled disclosure of historical information about the

physical location of users' devices at a given point in time. In the Modified Application, as detailed

further below, the government seeks disclosure of an anonymized list of identifiers for Google-

---

[2] Google has taken the position that the third-party doctrine should not defeat a cell-phone user's reasonable expectation of privacy in their location-history information because the user's sharing that information with a third-party such as Google is not truly voluntary. Brief of Amicus Curiae Google LLC at 20-22, *United States v. Chatrie*, No. 3:19-cr-00130-MHL (E.D. Va. Dec. 23, 2019), ECF No. 73. In the amicus brief Google submitted in *Chatrie*, Google argued that "as in *Carpenter*, the fact that users voluntarily choose to save and share [location-history] information with Google does not on its own implicate the third-party doctrine to the extent that doctrine is still viable." *Id.* at 20, 22. Drawing a comparison with the Supreme Court's reasoning in *Carpenter* that the "voluntary exposure" rationale underpinning the third-party doctrine did not justify applying the doctrine to cell-site location information since cell-phone users did not "genuinely 'share' such data with phone companies," Google argued that "the same is true of the location-based services [cell phones provide]." *Id.* at 21-22. These services, Google argued, are "such a pervasive and insistent part of daily life that [they are] . . . indispensable to participation in modern society." *Id.* at 22 (internal quotations omitted) (quoting *Carpenter*, 138 S. Ct. at 2220). As some scholarly commentary has observed:

> The third-party doctrine should not apply with respect to certain technologies because much of the information forfeited by individuals is completed on behalf of their devices. To waive Fourth Amendment protections, the individual must voluntarily provide information to a third party. However, many device users do not voluntarily relinquish information; rather, when the devices are powered on, information is sent on behalf of the individual to third parties. No voluntary action triggers this collection, and warrantless government searches conducted under the authority of the third-party doctrine should be unconstitutional. Because this is similar to the reasoning in *Carpenter*, this data collection should be given the same protections as CSLI [cell site location information].

Cristina Del Rosso & Carol M. Bast, *Protecting Online Privacy in the Digital Age: Carpenter v. United States and the Fourth Amendment's Third-Party Doctrine*, 28 Cath. U.J.L. & Tech. 89, 120-21 (2020). *See also* Chadwick Lamar, *The Third-Party Doctrine Crossroads: Rules and Direction for A Tech-Savvy Fourth Amendment*, 39 Rev. Litig. 215, 241 (2019) ("characterizing Carpenter as the new norm [with respect to the third-party doctrine] comports with the Supreme Court's trend towards providing more protection in light of technological advancement"); Daniel de Zayas, Note, *Carpenter v. United States and the Emerging Expectation of Privacy in Data Comprehensiveness Applied to Browsing History*, 68 Am. U. L. Rev. 2209, 2243-45 (2019) ("As technology increasingly integrates into modern society, perpetuating a rigid and unqualified third-party doctrine guarantees increasingly intrusive, 'absurd and problematic' government surveillance.").

connected devices detected within the three geofences, each of which applies to a distinct 45-minute time period on a specific day. The government also seeks compelled disclosure of subscriber information for the devices the government chooses, at its discretion, from the anonymized list of identifiers. The geofence areas themselves are far narrower than the cell-site information sought in *Carpenter*. The proposed geofences are roughly coterminous with the two places of business where they are deployed, although this issue warrants further discussion below. The Modified Application differs in a few important respects from the Initial Application denied by Magistrate Judge Weisman in the 7/8/20 Order. A further discussion of the Modified Application, and of the Initial Application and the order denying it, follows below.

## II.     The Modified Application's Effort to Address Concerns in the 7/8/20 Order

### A.     Parameters and Protocol of the Proposed Geofences

The Modified Application identifies two locations for the three geofences, one of which is at the first location ("Location 1"), and two of which are at the second ("Location 2"). Each of the geofences has specific geographical and time parameters.

Location 1 includes a commercial enterprise where the government contends – and the Court agrees – there is probable cause to believe, based on the agent's affidavit, that an unidentified individual ("the Unknown Subject") received a shipment ("Shipment 1") of stolen pharmaceuticals. The area proposed for the geofence at Location 1 is a polygon-shaped area around the commercial enterprise, which is located within a mixed-use commercial and residential building; the area covers the commercial enterprise outward to the sidewalk at the corner of the building, and upward several stories to the top of the building, encompassing residential units above the enterprise. Without disclosing Location 1 in this Opinion, the Court takes judicial notice of the fact that Location 1 is situated within a busy commercial and residential area on a major

9

arterial street in a major U.S. city, and that more than 100 residential units of varying size are in the whole of the building that houses Location 1. Location 1 houses retail establishments and is near a supermarket. It is not known how many residential units would be within the geofence, in whole or in part, but the geofence appears to cover about one-eighth of the space in the mixed-use building. The time and date parameters for this first geofence cover a 45-minute span of time on a single day, and the Court finds that there is probable cause to believe that the offense conduct reflected in Shipment 1 occurred at a particular point within this window of time at Location 1.

Location 2 includes a commercial enterprise where the government contends – and the Court agrees – there is probable cause to believe that the Unknown Subject shipped stolen pharmaceuticals on two separate occasions ("Shipments 2 and 3"). The two proposed geofences at Location 2 cover the same geographical area. The two geofences are proposed for a square-shaped area encompassing the commercial enterprise and a parking lot outside it and adjacent to a retail business on the same block as Location 2. The Court takes judicial notice of the fact that Location 2 is situated within a busy commercial area on a major arterial street in a major U.S. city and differs from Location 1 in that the commercial enterprise in Location 2 operates in a stand-alone building where there are no other apparent business users, and no residential users. Other retail or commercial enterprises operate near Location 2, including one business immediately adjacent to the parking lot within the proposed Location 2 geofences. The time and date parameters for the second and third geofences, both around Location 2, are separate 45-minute spans of time on two dates. The Court finds that there is probable cause to believe that the offense conduct reflected in Shipments 2 and 3 occurred at a particular point within those respective windows of time at Location 2.

The warrant sought by the government would compel Google to obtain and disclose to the government, under a three-stage prescribed protocol, data generated from the three geofences as to Google-connected devices during the specified dates and time frames as follows:

- First, the Modified Application seeks to have Google search for "location history" data, for those time frames, dates and locations, identifying the Google-connected devices that traversed the time, date, and geographic parameters of the geofences. This search by Google will generate "location points," which will consist of an identification of (a) the devices that were in the two physical locations during the specified date and time ranges, and (b) the devices that generated "location points" *outside* the search parameters but within a "margin of error" that "would permit the device to be located within" the search parameters, as the Modified Application has described this "margin of error."

- Second, for each of the Google-connected devices identified from the foregoing two sets of "location points," Google would produce to the government anonymized information specifying the unique device identifier, timestamp, location coordinates, "display radius," and "data source," to the extent this information is available.

- Third, the government would review the anonymized information and would communicate to Google the mobile device identifiers (from the anonymized information) as to which the government, under the authority of the warrant, obtains compelled disclosure by Google of the identifying subscriber information for the Google accounts associated with each of those specified mobile devices, identified at the government's discretion.

The information the government states it is seeking to obtain through this three-stage process is described as "[e]vidence and instrumentalities" of violations of the respective statutes the government views as having been violated, namely 21 U.S.C. § 829(e)(1) (dispensing a controlled substance without a valid prescription); 18 U.S.C. § 370 (the theft of medical products); and 18 U.S.C. § 1341 (mail fraud).

## B. The Initial Application and the 7/8/20 Order

In the Initial Application, the government also sought three geofences around the same two locations for the same time and date parameters. 7/8/20 Order at 1-2. However, unlike the Modified Application, the Initial Application drew the proposed geofences to encompass circular areas around Locations 1 and 2, each with a radius of 100 meters. In denying the Initial

11

Application, Judge Weisman found the proposed search to be unconstitutionally overbroad and lacking in particularity insofar as the proposed warrant did not disclose the items to be seized, with no objective limit on the government's ability to obtain information as to each of the devices within the proposed geofences. *Id.* at 4-8. The government submitted the Modified Application after the 7/8/20 Order in an apparent effort to address issues raised in that order, denying the Initial Application.

### 1. Overbreadth of the Initial Application

Judge Weisman reasoned that the areas within the geofences were "large," so that "the majority of the area sought encompasses structures and businesses that would necessarily have cell phone users who are not involved in these offenses," whereas "the government's evidence of probable cause is solely focused on one user of a cellular telephone." *Id.* at 4. Judge Weisman found the warrant "completely devoid of any meaningful limitation" with respect to the particularity of the items for which the government would be authorized to search. *Id.* To the extent the government argued that the third-party doctrine permitted the warrant sought in the Initial Application, Judge Weisman rejected that argument as well. *Id.* at 5. Judge Weisman also found unpersuasive the government's arguments that an identification of all devices at or near the targeted locations of the geofence warrant represented evidence of the identities of possible co-conspirators in the offense; the judge reasoned that the affidavit did not contain evidence of any co-conspirator involvement, and that the affidavit did not establish probable cause to believe that the geofence warrant would yield evidence linking co-conspirators to the described offenses. *Id.* Judge Weisman did not accept the government's argument that it had established probable cause (an issue that is different from particularity, as will be addressed further below) supporting the warrant based on information the warrant could be expected to yield about the identities of

12

witnesses to the offense. *Id.* at 6. The judge further concluded that the government had not substantiated its argument that the warrant sought in the Initial Application was not overbroad, primarily because the geographic scope of the request covered a "congested urban area encompassing individuals' residences, businesses, and healthcare providers," and "the vast majority of cellular telephones likely to be identified in this geofence will have nothing whatsoever to do with the offenses under investigation." *Id.*

### 2.    Lack of Particularity in the Initial Application

As to particularity, Judge Weisman concluded that the three-stage process proposed in the Initial Application did not satisfy the Fourth Amendment because it gave law enforcement agents unbridled discretion to obtain identifying information about each device detected in the geofences. *Id.* at 7. The application contained no language objectively limiting the number of devices as to which agents could obtain identifying information, such as "the five phones located closest to the center point of the geofence." *Id.* Importantly, for purposes of this Court's examination of the Modified Application, the 7/8/20 Order added:

> If the warrant did contain objective limits as to which cellular telephones agents could seek additional information, or the nature of the probable cause established in the warrant application suggested a very limited number of cellular telephones would be identified, the Court's concern with overbreadth and particularity might be satisfied .... [I]f the government had constrained the geographic size of the geofence and limited the cellular telephone numbers for which agents could seek additional information to those numbers that appear in all three defined geofences, the government would have solved the issues of overbreadth and lack of particularity.

*Id.* at 7, 8-9.

Finally, Judge Weisman did not agree that *United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018), supported the government's argument that the Initial Application satisfied the particularity requirement of the Fourth Amendment. As Judge Weisman pointed out, *McLamb*

13

found adequate a warrant that allowed agents to obtain identifying information "of any user or administrator who log[ged] into" an internet-based dark website where users could download or upload child pornography; in *McLamb*, there was probable cause to believe that anyone reaching the dark website was involved in possessing or trading child pornography, so that agents' discretion was in fact limited to seizing information about individuals as to whom probable cause was established. *Id.* at 7-8. Judge Weisman called that situation "the complete antithesis of the legal underpinning" of the Initial Application, in that:

> The government has established probable cause that *one* user of a cellular telephone in the geofence area has committed a criminal offense. The warrant seeks to gather evidence on potentially *all* users of phones in the geofence, completely at the agents' discretion.

*Id.* at 8. This point about probable cause, and to whom it has been established and not established, is an important one that will be addressed further below. In any case, the Court agrees with Judge Weisman that the government's reliance on *McLamb* does not move the needle on particularity.

**C.     The Government's Efforts, in the Modified Application, To Respond to the 7/8/20 Order's Concerns.**

To sum up the government's efforts to address the concerns in the 7/8/20 Order, the Modified Application differs from the Initial Application in these two key ways:

1.   The Modified Application casts the three requested geofences according to: (a) as to the geofence at Location 1, a polygon covering a corner of the multi-use building that houses the targeted commercial enterprise on the first floor, and (b) as to the two geofences at Location 2, a square encompassing the building in which only the targeted commercial enterprise is contained, and including the adjacent parking lot outside that building. By contrast, the Initial Application sought, as to each of the three respective geofences at Locations 1 and 2, an area within a circle around each of the two locations, with a 100-meter radius. These changes to the boundaries of the two geofences reduced their overall areas in an amount not quantified in the Modified Application, but in a manner significant enough to allow the Court to infer that the geofence at Location 1 no longer encompasses the whole of the mixed-use building around the commercial enterprise and no longer extends across the street to other retail or commercial locations (including a health care facility). But the Location 1 geofence does encompass both sidewalks at the corner of the mixed-use building still within the geofence. The geofences at Location 2 no longer reach

beyond the commercial enterprise's parking lot and into the retail business adjacent to the parking lot. But the Location 2 geofence still includes the whole of the parking lot, which abuts the outside of the retail business next door.

2. The Modified Application adds information about a municipal stay-at-home order in effect at the time of Shipments 2 and 3, within the time parameters of the two geofences sought at Location 2. The government notes that the stay-at-home order likely reduced the number of devices that were within the second and third geofences, as shown by a Google COVID-19 community mobility report indicating that in the urban county containing the municipality that issued the stay-at-home order, visits to retail and recreation locations were down 32 percent compared to the time before the stay-at-home order, visits to workplace and transit stations were down 40 percent, and visits to grocers and pharmacies were down 8 percent.

The Modified Application also included a third significant change from the Initial Application, but this third change is not plainly directed at any concern raised in the 7/8/20 Order. The Modified Applications calls for the areas to be searched (at both Locations 1 and 2) to include, in addition to the location history data reflecting Google-connected devices that Google calculated were in the geofences, the location history for such devices that "could have been (as indicated by margin of error, i.e. 'maps display radius') located within" the geographical area of the geofences at Locations 1 and 2 within the time and date parameters of the geofences. The Modified Application does not quantify the additional space encompassed by this "margin of error," stating only, in the affidavit, that "Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a 'maps display radius,' for each latitude and longitude point."[3]

---

[3] Additional information about the Google "margin of error," though not contained in the Modified Application, may be found in the public record on the docket in *United States v. Chatrie*, No. 19-cr-00130-MHL (E.D. Va.), a matter in which a federal court is considering a motion to suppress evidence obtained by a geofence warrant. According to a declaration filed in *Chatrie*, Google provided the following information:

> The location data points reflected in [Google Location History ("LH")] are estimates based on multiple inputs, and therefore a user's actual location does not necessarily align perfectly with any one isolated LH data point. Each set of coordinates saved to a user's LH includes a value, measured in meters, that reflects Google's confidence in the saved

The government's inclusion of such an undefined "margin of error" appears to expand the geographical areas within which location information will be captured under the proposed warrant, by an unquantified distance beyond the otherwise geographically smaller areas mapped in the Modified Application as compared to the Initial Application. The purpose of including this "margin of error" in the Modified Agreement appears to be directed at ensuring that the proposed warrant captures the location histories for Google-connected devices within the margin of error, i.e., to minimize the possibility that the geofences would miss or overlook a device that may have been inside Locations 1 or 2. In any event, even a small-scale expansion of the boundaries of the geofence at Location 1 captures more of the residential area of the surrounding building and the outdoor areas at the sidewalks within that geofence, increasing the chances that the information of uninvolved users would fall within the reach of the government at its discretion. Likewise, even a small-scale expansion of the boundaries around the Location 2 geofence increases the chance that

coordinates. A value of 100 meters, for example, reflects Google's estimation that the user is likely located within a 100-meter radius of the saved coordinates based on a goal to generate a location radius that accurately captures roughly 68% of users. In other words, if a user opens Google Maps and looks at the blue dot indicating Google's estimate of his or her location, Google's goal is that there will be an estimated 68% chance that the user is actually within the shaded circle surrounding that blue dot.

Notwithstanding the confidence interval described above, if a user's estimated location (*i.e.*, the stored coordinates in LH) falls within the radius of the geofence request, then Google treats that user as falling within the scope of the request, even if the shaded circle defined by the 68% confidence interval falls partly outside the radius of the geofence request. As a result, it is possible that when Google is compelled to return data in response to a geofence request, some of the users whose locations are estimated to be within the radius described in the warrant (and whose data is therefore included in a data production) were in fact located outside the radius. To provide information about that, Google includes in the production to the government a radius (expressed as a value in meters) around a user's estimated location that shows the range of location points around the stored LH coordinates that are believed to contain, with 68% probability, the user's actual location.

McGriff Decl. ¶¶ 24-25, *Chatrie*, No. 19-cr-130-MHL (E.D. Va. Mar. 11, 2020), ECF No. 96-1. It is not clear to the Court, from this declaration or from the Modified Application, how far the margin of error might extend, except perhaps that the additional area outside the geographical parameters of the Location 1 and 2 geofences might be measured in an unknown number of meters.

the location information and identity of Google-connected device users patronizing the retail business next to Location 2, parking near that retail business, or simply passing by, will be captured by the geofence even if such users never entered Location 2. Again, both Locations 1 and 2 are within busy urban areas.

## III.    Analysis of the Constitutionality of the Modified Application

The Court now proceeds to determine whether the Modified Application satisfies the Fourth Amendment's probable cause and particularity requirements, with a focus on the modifications the government made to the Initial Application in terms of geographic scope of the proposed search and the added fact of the stay-at-home order with regard to the two geofences at Location 2.

### A.    Probable Cause Determinations

The Modified Application poses a probable cause problem as well as a problem with particularity. The affidavit submitted in support of the Modified Application establishes that there is probable cause to believe that:

- A theft of pharmaceuticals has occurred.

- Location 1 was used to receive Shipment 1, Location 2 was used to send Shipments 2 and 3, and each of the shipments was evidence of the theft of pharmaceuticals.

- The Unknown Subject personally handled Shipments 1, 2 and 3 at a specific point in time within the respective time parameters (and on the dates) of the proposed geofence at Location 1 and of the two proposed geofences at Location 2.

- Within the location history retained by Google, evidence of the pharmaceutical theft and the identity of the perpetrator of that theft is likely to be found, in the form of a single device identifier (and corresponding subscriber information) of the Unknown Subject, who was seen on in-store surveillance video receiving Shipment 1 and sending Shipments 2 and 3.

However, the affidavit submitted in support of the Modified Application *does not establish probable cause* to believe that evidence of a crime will be found in the location history and

17

identifying subscriber information retrieved by Google, under the warrant, for persons *other than the Unknown Subject.*

The proposed warrant, by its terms, authorizes the government to obtain, at its discretion, the location history information and identity of everyone whose Google-connected device was detected in the three geofences (at Locations 1 and 2) during the 45-minute windows of those geofences. As such, the warrant resembles so-called "all persons" warrants, which allow search or seizure of all persons who happen to be found in a particular location suspected of being used for criminal activity. Federal appellate courts presented with constitutional questions of such "all persons" warrants have held that they fail to meet the Fourth Amendment's probable cause requirement, *unless* the affidavit establishes that there is probable cause to believe *every* person who entered the location engaged in the criminal activity. *See Marks v Clarke*, 102 F.3d 1012, 1029 (9th Cir. 1996) (stating that "a warrant to search 'all persons present' for evidence of a crime may only be obtained when there is reason to believe that *all* those present will be participants in the suspected criminal activity," and that such warrants "might be appropriate for a different kind of locale – one dedicated exclusively to criminal activity") (emphasis added); *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276 (4th Cir. 2004) ("[A]n 'all persons' warrant can pass constitutional muster if the affidavit and information provided to the magistrate supply enough detailed information to establish probable cause to believe that all persons on the premises at the time of the search are involved in the criminal activity.").

Here, the warrant seeks not the seizure of persons, but of information in which persons have a reasonable expectation of privacy. The analogy to the "all persons warrant" cases is apt.[4]

---

[4] The government's unsuccessful reliance on *McLamb* before Judge Weisman gives an inadvertent nod to this point. The search in *McLamb* was constitutional because there was probable cause to believe all persons in the child pornography dark website were engaging in criminal activity, but there is no such all-inclusive

The affidavit submitted in support of the Modified Application does not establish probable cause to believe that all persons whose devices are captured within the geofences were involved in the suspected theft of pharmaceuticals or the receipt or shipment of them. As to Location 1, the proposed warrant will allow the seizure of location and identity information of any person whose Google-connected device entered the commercial enterprise within the 45-minute window, as well as anyone with such a device who walked along the sidewalk outside the business, or who was present in one of the residential units above the business and within the geofence. As to Location 2, the warrant would allow the seizure of the same information as to any Google-connected device user who entered the commercial enterprise during either of the 45-minute windows, as well as such persons who used the parking lot outside the business, including any customers of the retail business that immediately abuts the parking lot, if they entered the parking lot.[5]

The Seventh Circuit has not yet spoken explicitly on "all persons" warrants, but the Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85 (1979), is instructive in the analysis of whether a warrant allowing a seizure of information about all persons who traverse the three geofences can pass constitutional muster. *Cf. Owens*, 372 F.3d at 275 (stating that *Ybarra* "sheds additional light on our analysis" of "all persons" warrants). In *Ybarra*, police obtained a warrant to search a public tavern and the bartender for narcotics, but the police expanded the warrant's terms and searched a bar patron, with no particularized reason to search him or authorization to do so. 444 U.S. at 91. The Supreme Court held that a search of everyone in the bar, including the patron, violated the Fourth Amendment, concluding that:

> [A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.

---

probable cause as to the persons whose location history and identifying information would be authorized to be seized under the Modified Application's proposed warrant.

[5] It is not known, from the Modified Application, whether the business next to Location 2 was open to customers during the relevant stay-at-home order.

> Where the standard is probable cause, a search or seizure of a person must be supported by *probable cause particularized with respect to that person*. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Id.* (emphasis added) (citation omitted). In effect, that kind of authority, based only on "propinquity," is precisely what the government seeks in the Modified Application. Armed with the warrant it seeks, the government would have unlimited discretion to obtain from Google the subscriber information of anyone whose Google-connected devices traversed the geofences (including their vaguely defined margins of error), based on nothing other than the "propinquity" of these persons to the Unknown Subject at or near the time of Shipments 1, 2 and 3.

The Seventh Circuit's treatment of *Ybarra* teaches us that more is required, or that at least some evidence of a person's involvement in the suspected crime is required in order for the Fourth Amendment to allow the seizure of that person – or, by analogy the seizure of things, such as location information, in which persons have a reasonable expectation of privacy. *See United States v. McCauley*, 659 F.3d 645, 649-50 (7th Cir. 2011) (distinguishing *Ybarra*, in which officers knew "nothing in particular" about the defendant they searched, where officer knew that McCauley matched the defendant's description and was identified by a witness as having participated in a beating hours earlier); *United States v. Reed*, 443 F.3d 600, 604 (7th Cir. 2006) ("[T]he totality of the circumstances in this case similarly leads to an inference of a common enterprise to which an innocent person would not likely be admitted."); *United States v. Price*, 184 F.3d 637, 642 (7th Cir. 1999) (finding warrant complied with the Fourth Amendment where it was "not a sweeping search of everyone who happened to be on the premises – this was a search of one of four individuals who exited a car that was suspected of transporting cocaine"); *United States v. Pace*, 898 F.2d 1218, 1240 (7th Cir. 1990) (holding that probable cause existed to arrest suspects present

20

in close proximity to drugs in a drug house maintained by a third person who could be assumed not to have entrusted unknowing persons to be in the drug house). Because the proposed warrant here seeks information on persons based on nothing other than their close proximity to the Unknown Subject at the time of the three suspect shipments, the Court cannot conclude that there is probable cause to believe that the location and identifying information of any of these persons contains evidence of the offense.

### B. Particularity Determination

The Supreme Court in *Ybarra* also cited the Fourth Amendment's particularity requirement and the bar on general warrants for the proposition that "a warrant to search a place cannot normally be construed to authorize a search of each individual in that place." 444 U.S. at 92 n.4. This Court adopts Judge Weisman's reasoning, as stated in the 7/8/20 Order, in finding that the proposed warrant in the Modified Application, like the one appended to the Initial Application, is overbroad and fails to comply with the particularity requirement. *See* 7/8/20 Order at 4-8. Attachment B to the warrant, listing the items to be seized, does not identify any of the persons whose location information and identities the government will obtain from Google. As such, the warrant puts no limit on the government's discretion to select identifying subscriber information from among the anonymized list of Google-connected devices that traversed the geofences. A warrant that meets the particularity requirement leaves the executing officer with no discretion as to what to seize, *Stanford*, 379 U.S. at 485, but the warrant here gives the executing officer unbridled discretion as to what location history and identifying subscriber information is to be seized from within the geofences. The warrant proposed in the Modified Application is not just "overbroad." It is an unconstitutional general warrant.

21

Although the government appeared to be following Judge Weisman's suggestions that a narrower search might pass constitutional muster, the modifications the government made to the geofence boundaries do not solve the constitutional problem because although the modifications may well reduce the number of devices Google identifies as having traversed the geofences, the Court still has no idea how many such devices and their users will be identified under the warrant's authority. The warrant in the Modified Application continues to authorize the seizure of identifying information of this unknown number of unnamed persons. If a large group of persons entered Location 1 or 2 during the geofence time parameters with Google-connected devices, their information will be seized (or may be seized by the government in its discretion). Any persons who happened to walk on the sidewalks within the geofences at Location 1, carrying Google-connected devices, will have their information subject to seizure. Any persons in the upper residential floors of the mixed-used building that houses Location 1 will have their information subject to seizure if they were within the geofence with a Google-connected device. And anyone who entered the parking lot within Location 2 with a Google-connected device, including those who may have been patronizing the adjoining retail business or determining whether it was open, will have their information seized. The Court appreciates the government's effort to reduce the number of persons whose information is subject to seizure, or to reduce the odds that it could be a high number, but the Court simply has no way of knowing how many persons not connected to the Unknown Subject, or the offense, will be caught in the net of this warrant. All we know is that the information of an undetermined number of uninvolved persons is authorized to be seized.[6]

---

[6] The Court offers no opinion or speculation on whether further modifications to the proposed geofences would avoid the constitutional infirmities set forth in this Opinion with respect to the Modified Application. By its very nature, a geofence warrant is not targeted to a specific individual or account. Courts confronted with future warrant applications will have to wrestle with similar questions about probable cause and about whether the warrant proposes a "general, exploratory rummaging" that the Fourth Amendment prohibits. *See Coolidge*, 403 U.S. at 467; *Andresen v. Maryland*, 427 U.S. 463, 480 (1976).

The government's addition of facts concerning the stay-at-home order in effect at the time of Shipments 2 and 3 (at Location 2) also does not help the government's cause, for similar reasons. The Court still has no way of knowing how many Google-connected devices traversed the busy urban area of the Location 2 geofences, and to assume the number of persons was reduced by the stay-at-home order based on the statistics the government presented would be pure speculation. Even if the Court could be assured that the number of Google-connected devices within those two geofences were reduced, the seizure of information associated with those devices and their users would still suffer from the same Fourth Amendment shortcomings with respect to probable cause and particularity.

Finally, the government's expansion of the boundaries of the polygons or squares in the three proposed geofences, to include Google's "margin of error" without specifying the geographical expansion that the "margin of error" would entail, only heightens the risk that the geofences will capture the location history and identification information of Google-connected device users for whom no probable cause for involvement in the offense is shown, and who are linked the offense or to the Unknown Subject only by propinquity. The "margin of error" addition in the Modified Application does not address any of the concerns raised in the 7/8/20 Order or in this Opinion. Rather, it appears to be a belt-and-suspenders approach to seize more information so that information within the "margin of error" is captured, where it might not have been captured if the warrant authorized only collection and culling of the location points strictly within the geofences' latitudinal and longitudinal boundaries.

In sum, the government's modifications to the Initial Application do not cure the constitutional problems that caused Judge Weisman to deny that application in the 7/8/20 Order,

nor do those modifications render the Modified Application constitutional under the analysis set forth in this Opinion.

## CONCLUSION

The technological capability of law enforcement to gather information, from service providers like Google and others, continues to grow, as demonstrated here by the Modified Application. Our appeals court has recognized, for quite some time now, that "[t]echnological progress poses a threat to privacy by enabling an extent of surveillance that in earlier times would have been prohibitively expensive." *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir. 2007). In *Carpenter* and *Riley*, the Supreme Court recognized that as the use of mobile electronic devices becomes more and more ubiquitous, the privacy interests of the general public using these devices, including the privacy interest in a person's physical location at a particular point in time, warrants protection. 138 S. Ct at 2217; *see Riley*, 573 U.S. at 393. Longstanding Fourth Amendment principles of probable cause and particularity govern this case, and the technological advances making possible the government's seizure of the type of personal information sought in this case must not diminish the force and scope of Fourth Amendment protections with roots in the reviled abuses of colonial times. Simply because Google *can* collect this information, or because the government *can* obtain it from Google, does not mean that the government may do so lawfully under the Fourth Amendment. The positive effects of application of these kinds of technological advances to the ends of crime control, or to the solution of particular crimes, do not change the nature of the Fourth Amendment's requirements. The ability to use Google's capabilities to identify a wrongdoer by identifying everyone (or nearly everyone) in the vicinity of the crime scene when the crime occurred is tempting. But if the government can identify that wrongdoer only by sifting through the identities of unknown innocent persons without probable cause, in a

manner that contravenes Fourth Amendment standards and renders the authority an impermissible general warrant, a federal court in the United States of America should not permit the intrusion. Nowhere in Fourth Amendment jurisprudence has the end been held to justify unconstitutional means.

For the foregoing reasons, and by applying the Fourth Amendment to the government's proposed warrant in the Modified Application, the Court must deny the Modified Application and the warrant requested under it.

**SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: July 24, 2020**

25